Argued and submitted September 24, 2020; convictions for first-degree rape (Count 1) and second-degree sexual abuse (Count 2) reversed and remanded for entry of a judgment of a single conviction for first-degree rape, remanded for resentencing, otherwise affirmed February 24, 2021

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# JOHN VIRGIL BENSON,
*Defendant-Appellant.*

## Linn County Circuit Court
## 17CR32143; A168977

483 P3d 689

Defendant challenges his convictions for first-degree rape, ORS 163.375, second-degree sexual abuse, ORS 163.425, and attempted first-degree sexual abuse, ORS 161.405; ORS 163.427. After being notified that defendant had sexually assaulted B, the police opened an investigation and then stopped investigating for about seven years and seven months before resuming. Before the bench trial, defendant moved to dismiss for preindictment delay, but the trial court denied that motion. On appeal, defendant first assigns error to the trial court's denial of his motion to dismiss for preindictment delay. In his third assignment of error, he asserts, and the state concedes, that the trial court plainly erred when it failed to merge the guilty verdict of second-degree sexual abuse (Count 2) with the conviction for first-degree rape (Count 1). *Held*: The trial court did not err in denying the motion to dismiss the indictment, but the Court of Appeals accepted the state's concession that the trial court plainly erred in failing to merge the guilty verdicts on Counts 1 and 2. The court rejected defendant's remaining assignments of error without further discussion.

Convictions for first-degree rape (Count 1) and second-degree sexual abuse (Count 2) reversed and remanded for entry of a judgment of a single conviction for first-degree rape; remanded for resentencing; otherwise affirmed.

Daniel R. Murphy, Judge.

Kali Montague, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Doug M. Petrina, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

ORTEGA, P. J.

Convictions for first-degree rape (Count 1) and second-degree sexual abuse (Count 2) reversed and remanded for entry of a judgment of a single conviction for first-degree rape; remanded for resentencing; otherwise affirmed.

**ORTEGA, P. J.**

After being notified that defendant had sexually assaulted B, the police opened an investigation and then stopped investigating for about seven years and seven months before resuming. Eventually, a grand jury indicted defendant with first-degree rape (ORS 163.375), second-degree sexual abuse (ORS 163.425), and attempted first-degree sexual abuse (ORS 161.405, ORS 163.427). Before the bench trial, defendant moved to dismiss for preindictment delay, but the trial court denied that motion and found defendant guilty on all charges. On appeal, defendant raises six assignments of error; we write only to address the first and third assignments and reject the remaining assignments without further discussion.

Defendant first assigns error to the trial court's denial of his motion to dismiss for preindictment delay. For his third assignment, he asserts, and the state concedes, that the trial court plainly erred when it failed to merge the guilty verdicts of second-degree sexual abuse (Count 2) and first-degree rape (Count 1). We conclude that the trial court did not err in denying the motion to dismiss the indictment, but accept the state's concession that the trial court plainly erred in failing to merge the guilty verdicts on Counts 1 and 2. We therefore reverse on those counts and remand for entry of a single conviction for first-degree rape, remand for sentencing, and otherwise affirm.

The background facts are undisputed. In April 2009, B disclosed to her counselor at Rimrock Trails Adolescent Treatment Center (Rimrock) that defendant had sexually assaulted her 11 months earlier. At the time of the assault, defendant was 21 and B was 16. Following her disclosure, the Prineville Police Department (PPD) was notified and interviewed her on April 9. On April 15, the case was transferred to Officer Webber of the Lebanon Police Department (LPD), who assigned the case to Detective Martinez and provided him with a short summary of the case attaching a detailed report from PPD with the interview of B and the names of potential witnesses to interview. Webber's summary referred generally to "a report from [PPD] of a possible rape" and stated that he had "reviewed the details."

However, it did not mention the name of the counselor who made the initial call or any report of it, and the PPD report itself is not part of the record. An LPD report was generated that included a crime code designation of "Rape III—Under 16 *** Stat[utory] Rape—No Force." Either Martinez or Webber likely made the Rape III designation.

Martinez interviewed B in April and another witness shortly thereafter. He attempted to locate defendant but was unable to, and the investigation halted within about a month. Martinez could not provide a complete explanation of why, except to note that around that time he was reassigned to patrol sergeant and "it was *** a situation that because of transitions and things like that, it appears that somehow it was overlooked in the process and by incoming investigators." Defendant's criminal history reflected that LPD, the Linn County Sheriff's Office, and the Sweet Home Police Department, all located within Linn County, arrested defendant numerous times between 2008 and 2016, including for alleged probation and parole violations.

In November 2016, about 91 months later, LPD resumed investigation of the case after the LPD records department, which periodically searches old cases, discovered it in an "open-case search." The case was eventually assigned to Detective Padua, who reviewed the original PPD report and LPD report and resumed the investigation, ultimately resulting in an indictment in May 2017.

Before trial, defendant moved to dismiss the indictment, contending that the delay of seven years and seven months (91 months) violated his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution.[1] Central to defendant's argument was his assertion that the drug-treatment counselor produced a report documenting B's initial disclosure that was destroyed during the delay. To support that argument, defendant's investigator, Blehm, testified that he went to Rimrock to

---

[1] The Due Process Clause of the Fifth Amendment provides, "No person shall *** be deprived of life, liberty, or property without due process of law[.]" Similarly, the Due Process Clause of the Fourteenth Amendment provides, "No State shall *** deprive any person of life, liberty, or property, without due process of law[.]"

"find out what their intake policies were" and "what they did when they [take] somebody in." He understood that Rimrock had generated a report but was unable to procure it. At that point, the court took judicial notice of OAR 415-054-0430(9), which provided that drug and alcohol treatment records "shall be kept for a minimum of seven years." Blehm also testified that he was not able to determine which Rimrock counselor conducted the intake. At the time he went to Rimrock to speak to its staff, he did not have a release of information from B to speak to them about her case. Martinez also testified at the hearing, but had trouble recalling details of his investigation.

Defendant argued that the state was culpable for the delay because, other than asserting that police could not locate defendant in 2009, it provided no other justification or explanation for the 91-month delay. Further, defendant asserted that the Rimrock counselor generated an intake report[2] when B disclosed the abuse but that the report was destroyed and no longer available. He pointed to the administrative rule that permits destruction of drug and alcohol treatment records after seven years as proof that the records were destroyed. Defendant argued that he was thus prejudiced by not being allowed "the opportunity to examine and compare" the statements that B made to the Rimrock counselor with her statements to the detectives. He contended that the statements to the counselor would be "substantively different in character, considering the priorities and purpose of revealing such personal information," from B's statements to the detective, which were made for investigative purposes. Defendant also argued that, due to the delay, Martinez had "amnesia to the events that took place eight years ago when he initially investigated" the case and that there would be "further witness amnesia to [the] facts" related to the counselor's report. Defendant argued that he was prejudiced because he was "unable to press upon the facts and view all of the investigative reports and the details." The state responded by conceding that the delay may have been due to negligence or recklessness but was

---

[2] Defendant argued, and the state did not dispute, that B's disclosure was made at her intake assessment when she entered Rimrock, but offered no further evidence regarding the details of that disclosure.

not intentional. Further, according to the state, defendant failed to show that he was actually prejudiced because his assertions about the content of the drug and alcohol records were purely speculative and the records did not necessarily contain information needed for defendant's case.

The trial court denied defendant's motion. It found that the state was "clearly culpable in the delay" due to negligence by LPD, but found no evidence of reckless or intentional conduct. The court further found that any prejudice to defendant was speculative:

> "All of the witnesses are available, or at least there's no evidence they're not available. And there's no specific evidence that a witness remembers—would have remembered something back at the time of the initial investigation and then failed to remember it."

The court explained that it would have "to speculate about to what extent or to what degree memory had been attenuated as a result of the delay."

The charges against defendant were tried to the court, which heard testimony that defendant forcibly raped B and attempted to forcibly place his penis in her mouth. For that conduct, the court convicted defendant of first-degree rape,[3] second-degree sexual abuse,[4] and attempted first-degree sexual abuse.[5] At sentencing, the court imposed

---

[3] ORS 163.375 provides, in relevant part:

"(1) A person who has sexual intercourse with another person commits the crime of rape in the first degree if:

"(a) The victim is subjected to forcible compulsion by the person[.]"

[4] ORS 163.425 provides, in relevant part:

"(1) A person commits the crime of sexual abuse in the second degree when:

"(a) The person subjects another person to sexual intercourse, oral or anal sexual intercourse *** and the victim does not consent thereto[.]"

[5] ORS 163.427 provides, in relevant part:

"(1) A person commits the crime of sexual abuse in the first degree when that person:

"(a) Subjects another person to sexual contact and:

"*****

"(B) The victim is subjected to forcible compulsion by the actor[.]"

ORS 161.405(2)(c) provides that a "person is guilty of an attempt to commit a crime when the person intentionally engages in conduct which constitutes a substantial step toward commission of the crime."

a true-life sentence under ORS 137.719[6] based on convictions from 2011 and 2016 for sexual offenses defendant had committed after the incident in this case.

We first address defendant's challenge to the trial court's denial of his motion to dismiss. Defendant argues, as he did below, that the 91-month preindictment delay violated his due process rights. In addition to noting that the trial court's finding that the state was culpable for the preindictment delay due to negligence is supported by the evidence, defendant argues that the trial court erred in concluding that he was not actually prejudiced by the delay. He contends that the missing intake report could have been used to cross-examine B "on any inconsistencies she might have from the initial disclosure that preceded her testimony by nearly a decade" and that, because the case lacked physical evidence, her credibility was crucial to the state's case and the report would have been critical impeachment evidence. He argues that "[t]here are often inconsistencies the more times a person describes past events, and even if there were none after nearly a decade, defense counsel could have challenged [B]'s credibility based on apparent rehearsal of the charges." Further, he argues, "knowing what is contained in an initial disclosure is important to ensure that the witness disclosed based on her own memories and that her answers were not obtained through suggestive interviewing tactics."

Defendant proposes a second way in which he was prejudiced, arguing that, had the state promptly advanced the prosecution, he would not have been subject to a true-life sentence under ORS 137.719. Specifically, defendant argues that if he had been convicted and sentenced to the crimes closer to when police began investigating in 2009, he would have been "incarcerated until at least 2017" and "would not have had an opportunity to commit the 2011 and 2015 crimes." Finally, defendant argues that, on balance, the actual prejudice outweighed the negligent justification for the delay.

---

[6] ORS 137.719(1) provides that "the presumptive sentence for a sex crime that is a felony is life imprisonment without the possibility of release or parole if the defendant has been sentenced for sex crimes that are felonies at least two times prior to the current sentence."

The state counters that the trial court properly denied defendant's motion to dismiss, though it does not challenge the court's finding that the delay was attributable to the state's negligence. It argues that defendant failed to carry his burden of proving substantial, actual prejudice resulting from the delay because "it is unknown whether the counselor actually mentioned the disclosure in the report and, if so, what the counselor reported." Consequently, defendant can only speculate that the missing report might have helped his defense[7]—and to the extent defendant showed actual prejudice, that prejudice was slight. Thus, given the lower level of government culpability, on balance, the delay "did not violate society's fundamental conceptions of justice, fair play, and decency, and hence did not violate due process," according to the state. Further, addressing defendant's claim that he was prejudiced because, but for the delay, he would not have been subject to a true-life sentence under ORS 137.719, the state argues that defendant failed to preserve that argument and we should not consider it. In all events, the state contends that defendant's argument regarding the availability of a true-life sentence fails on the merits.

In a reply brief, defendant raises another reason why, in his view, the report was valuable impeachment evidence. Defendant notes that the LPD report indicated that the case was initially determined to be third-degree rape with "no force." Because defendant was indicted about a decade later for first-degree rape by forcible compulsion, "[h]aving the report of the initial disclosure would have provided defendant with, at a minimum, the counselor's identity to question her about that discrepancy, which defendant could have used to impeach" B. Further, regarding

---

[7] The state also argues, in what amounts to an alternative basis to affirm, that defendant failed to establish even the existence of the treatment report or that it was destroyed. However, the record reveals that there are competing inferences that could be drawn from the evidence that was presented on these points. Further, the trial court did not make any factual findings regarding whether the report existed or was unavailable. Therefore, this is not a case where we would exercise our discretion to apply the "right for the wrong reason" principle and affirm on an alternative basis. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-63, 20 P3d 180 (2001) (discussing conditions that must be met for reviewing court to affirm on an alternative basis, including that the "facts of the record be sufficient to support the alternative basis to affirm").

defendant's assertion that he was prejudiced because he received a true-life sentence, he contends that, contrary to the state's argument, he sufficiently preserved his claim. Alternatively, he asks us to exercise our discretion to review the claim for plain error.

We review a trial court's denial of a motion to dismiss for preindictment delay for errors of law. *State v. Whitlow*, 262 Or App 329, 332, 326 P3d 607 (2014). We are bound by the trial court's express and implicit factual findings that are supported by the record. *State v. Davis*, 345 Or 551, 564-65, 201 P3d 185 (2008).

Preindictment delay implicates a defendant's Fifth and Fourteenth Amendment due process rights. *Whitlow*, 262 Or App at 337. As the Supreme Court has explained:

> "To demonstrate that preindictment delay violated the federal Due Process Clause, a defendant must show that the delay actually prejudiced the defendant and that the government culpably caused the delay. A court must weigh the government's reasons for the delay against the prejudice to determine whether the delay violated our society's fundamental conceptions of justice, fair play, and decency."[8]

*State v. Stokes*, 350 Or 44, 57, 64, 248 P3d 953 (2011) (relying on the minority test as established in the Ninth and Fourth Circuit Courts of Appeal). The "statute of limitations is a defendant's primary protection" against a state delay in bringing criminal charges, "making due process violations unusual." *Id.* at 57.

To guide our decision, we look to prior cases evaluating whether a defendant's due process rights were violated from preindictment delay. In *Davis*, a murder prosecution, the court rejected the defendant's contention that he was prejudiced by an 11-year delay from the loss of evidence and witnesses. 345 Or at 575. The defendant provided the state with an alibi as to his whereabouts on the night of the murder that was corroborated by several witnesses, and another potentially important witness could not be located. *Id.* at 562-63. The investigation "stalled" and, other than a lead

---

[8] For purposes of preservation, the state challenges the standard set out in *Stokes*. However, it concedes that we are bound by that decision.

that was pursued about five years later but went nowhere, did not resume for about 10 years until a witness came forward with information that the defendant had admitted to the murders. *Id*. at 559-60. From that lead, the investigation turned up new witnesses, and the state was able to finally locate and interview the missing witness who provided inculpatory information. *Id*. Approximately 11 years after the halt in the investigation, the defendant was ultimately convicted of aggravated murder. *Id*. at 564.

The defendant argued that he was prejudiced by the 11-year prosecutorial delay from the loss of items that were obtained by the police when the investigation began but that were missing by the time he was indicted, and by the unavailability of other items or information that the police could or should have obtained through diligent investigation. *Id*. at 573. The court rejected those arguments, concluding that the defendant's claims of prejudice from the unavailability of those items was based on speculation. *Id*. at 574.

> "Those potential witnesses and possible items of evidence might have shed light on the case, and the light they shed might have been favorable to [the] defendant. Or they might have had no evidentiary value, or they might have bolstered the case against defendant. Either conclusion requires speculation."

*Id*. at 575.

The court explained that "[s]imply identifying items and information of undetermined evidentiary value that the police theoretically could have obtained does not satisfy defendant's burden to demonstrate actual prejudice." *Id*. The court also rejected the defendant's argument that he was prejudiced by the loss of a 9-1-1 call because "the asserted value of its contents is *** entirely speculative," and noted that "[n]othing in the record *** suggests that the contents [of the recording] would support" his defense theory as to the call's value. *Id*. at 575-76. Regarding the balancing of the state's culpability for the delay against the asserted prejudice, the court concluded that, "[e]ven if the prejudice on which [the] defendant relies is sufficient to be placed on the scale *** it at most would weigh very lightly."

*Id*. at 576. "[A]s a matter of law, the reason for the state's delay in indicting defendant—*i.e.*, the need to sufficiently investigate the crimes and obtain probable cause to bring charges—do not tip the scales at all." *Id*. at 576. Thus, the court concluded that the defendant had failed to establish any due process violation from the preindictment delay. *Id*. at 578.

   *Stokes* came to a similar conclusion. In that case, the defendant was under investigation for sex crimes, but the state closed the investigation when the prosecutor learned that the defendant would be serving a life sentence in California on an unrelated case. *Stokes*, 350 Or at 46-47. As a result, three years later, the police purged its evidence file on the case, destroying a 9-1-1 call recording, the contents of a rape kit, the victim's clothing, and towels and clothing taken from the defendant's house the day after the assault. *Id*. at 47. Eight years after the state's decision to close the case, another prosecutor in the same office learned that the defendant's California conviction was reversed. *Id*. The prosecutor reopened the defendant's case, which ultimately led to his conviction on sexual assault charges. *Id*.

   The defendant argued that the eight-year, preindictment delay violated his due process rights because of the lost evidence and witnesses. *Id*. at 54-55. The trial court denied the defendant's motion, and this court affirmed. *Id*. at 48.

   On review, the Supreme Court affirmed. The court first evaluated whether the defendant had met his burden of showing actual, non-speculative prejudice. With regard to the loss of the rape kit, the victim's clothing, and the towels and clothing seized from the defendant's house, the court noted that,

   "[p]resumably, [the] defendant would contend that [that evidence] may have been inconsistent with the state's theory, although [the] defendant does not offer a specific reason why the loss of that evidence was prejudicial. Indeed, without knowing the quality of that evidence, [the] defendant can only speculate that it might have helped his defense."

*Id.* at 60. Regarding the loss of one witness and the 9-1-1 call, the court noted that the defendant's claim that one victim and the 9-1-1 call "might have" shown that the victim had a calm demeanor after the assault was too speculative. *Id.* at 60-61. Specifically, the court stated that the defendant did not point to any evidence "supporting a conclusion that the [witness] or the 9-1-1 tape was more likely to help rather than hurt [the] defendant's case. He can only speculate as to the victim's demeanor." *Id.* at 61.

Even accounting for the government's culpability, the court noted that the defendant had demonstrated "only the slightest potential prejudice caused by the delay, which '[e]ven if *** sufficient to be placed on the scale for purposes of the *** balancing test, *** at most would weigh very lightly.'" *Id.* at 61. The court concluded that "[t]he state initially closed the case based on a good-faith belief that [the] defendant would serve a life sentence" and prosecuting the case "was not a good use of public resources." *Id.* at 62-63. Thus, the court concluded that "the state's actions do not demonstrate the government culpability and the degree of actual prejudice that violate due process." *Id.* at 63.

*Whitlow* came to the opposite conclusion. There, the defendant was being investigated for possible sexual abuse charges. After the lead detective interviewed the victim and spoke to her mother and a staff member from the child abuse assessment center where the victim was examined and interviewed, he authored an investigative report. *Whitlow*, 262 Or App at 333. However, the detective ceased any further investigation after only a few days. *Id.* About 19 months later, the district attorney's office reviewed the case and declined to prosecute, noting that the victim could not be located. At the time, the victim was living and attending middle school in a neighboring county. *Id.* The case was reopened about four years after the victim first reported the abuse when an anonymous caller contacted the Department of Human Services (DHS) to report that the defendant had molested the victim. *Id.* at 333-34. By this time, the lead detective had left the sheriff's office and relocated to Puerto Rico. *Id.* at 334. About five years after the victim had first reported the sexual abuse, the defendant

was indicted on multiple counts of sexual abuse. *Id*. at 335. At trial, the victim testified to incidents of sexual assault that were not included in the detective's original report. *Id*. When defense counsel questioned her about whether she had reported those incidents to the detective, she responded that she could not remember. *Id*. After the first trial resulted in a mistrial and the state re-prosecuted the case, the defendant moved to dismiss based on preindictment delay. *Id*. He argued that he was prejudiced because, due to the delay, the lead detective who authored the report was unavailable and he therefore could not call him as a witness to impeach the victim's trial testimony as inconsistent with her statements of the alleged abuse contained in his report. *Id*. at 331. The trial court granted the motion and the state appealed. *Id*.

On appeal, we affirmed. First, we agreed with and accepted the state's concession that the lead detective was unavailable as a result of the preindictment delay. *Id*. at 338. We then examined whether the state was culpable for the delay and concluded that the state was "unjustified and negligent in delaying the indictment." *Id*. We explained that "investigative activity inexplicably ceased *** almost immediately after it began, and no further investigation occurred until DHS received an anonymous call [about four years later]." *Id*. at 344. We further noted that "the record [did not] disclose any other significant investigative difficulties," and that the "state has provided *no* rational, good-faith justification for why the case against defendant languished for years." *Id*. at 344-45 (emphasis in original). With respect to actual prejudice, we rejected the state's argument that the asserted prejudice was speculative, concluding that the defendant had "identified with particularity the asserted actual prejudice resulting from [the lead detective's] unavailability." *Id*. at 345. We noted that "the nature and content of the 'missing' or 'lost' evidence, [the lead detective's] putative testimony, and its utility to the defense" was "far from 'speculative'":

> "It is hardly 'speculative' to assume that an experienced detective would confirm the thoroughness of his or her interview with the complainant in a sexual abuse investigation and the comprehensive accuracy of the consequent

> investigative report. Nor is it speculative to posit that such first-person testimony by the principal investigating detective—as opposed to mere admission of the report itself—would likely powerfully buttress an implication of material inconsistency by the complainant."

*Id*. at 348. We also rejected the state's argument that the defense could have called another detective to impeach the victim, concluding that it was "the discrepancy between [the lead detective's] report and [the victim's] testimony that [was] crucial to [the] defendant's impeachment theory," and the other officer's testimony was "not an equivalent substitute." *Id*. (emphasis in original). Thus, giving no weight to the state's unjustified and negligent delay, we concluded that "on balance, the actual prejudice to [the] defendant, which, in this credibility-predicated case is substantial, outweighs the state's reasons for the delay." *Id*. at 350.

Here, the state does not challenge the trial court's finding that it was culpable for the 91-month delay. This case is unlike *Stokes* where the state had a good-faith basis to halt the investigation to save public resources based on the belief the defendant would be incarcerated for life in another state. Rather, like *Whitlow*, "investigative activity inexplicably ceased *** almost immediately after it began," and "the record [did not] disclose any *** significant investigative difficulties." 262 Or App at 344-45. Also like *Whitlow* and unlike *Stokes*, the "state provided no rational, good-faith justification for why the case against defendant languished for years." *Id*. at 345. Accordingly, the trial court's finding that the state was culpable and negligent for the pre-indictment delay is supported by the record.

We next consider whether defendant established that he was actually prejudiced by the delay, beginning with his argument that, because of the delay, he was subject to a life sentence. As noted, the state argues that defendant failed to preserve that argument. On the merits, the state contends that defendant's argument fails because (1) it was not the state but defendant who caused that "prejudice"; (2) sentencing consequences are not a cognizable basis for a claim that preindictment delay violated due process; (3) defendant's claim of sentencing prejudice is speculative

because ORS 137.719(2) provides authority for a downward departure based on "substantial and compelling reasons"; and (4) even if due process extends to this context, the remedy would be limited to "a challenge at sentencing to the application of ORS 137.719" and would not merit a dismissal of the indictment.

Defendant responds that he sufficiently preserved his argument. He notes that he assigned error to the trial court's denial of his motion to dismiss and, relying on *Stull v. Hoke*, 326 Or 72, 948 P2d 722 (1997), contends that, although his basis for establishing prejudice on sentencing grounds is different than the basis he asserted at the trial level, "the overarching error—that the state's 91-month delay prejudiced defendant—was before the court." Alternatively, defendant asks that we review the error as plain, because the error appears on the face of the record and because it is obvious that sentencing consequences flowing from a preindictment delay violate due process.

In general, a claim of error that has not been raised in the trial court will not be considered on appeal. *State v. Parkins*, 346 Or 333, 338, 211 P3d 262 (2009). Typically, raising an issue at trial is "essential," whereas identifying a source for a claimed position or making a particular argument is less so. *State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988). For adequate preservation, an issue must be "raised with sufficient clarity in the trial court to put the trial court on notice that it needs to rule on the issue and for the opposing party to have an opportunity to address the issue." *Ploplys v. Bryson*, 188 Or App 49, 58, 69 P3d 1257 (2003). The preservation requirement permits a trial court to consider and rule on a contention first, thus possibly avoiding an error or correcting one already made. *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008). Additionally, it "fosters full development of the record, which aids the trial court in making a decision and the appellate court in reviewing it." *Id*. at 219-20. Ultimately, preservation decisions will turn on whether the court concludes that the policies underlying the rule have been adequately served. *Parkins*, 346 Or at 341.

Here, consideration of defendant's argument that he was prejudiced by the preindictment delay because he

became subject to a true-life sentence under ORS 137.719 would not comport with preservation principles. In his motion to dismiss, defendant asserted that he was prejudiced by the delay because an alleged report of B's initial disclosure to her counselor became unavailable and that, as a result of the delay, Martinez "had amnesia" as to the events and that there would be "further witness amnesia" related to the missing counselor's report. The state's response and the trial court's ultimate conclusion were based on the view that defendant's claims required speculation as to the impacts of the missing report and any impact on witness memory. There is nothing in the record that reasonably alerted the trial court to an argument that defendant was prejudiced because he was now subject to a true-life sentence, nor did the state have a reason to address that issue. Even at defendant's sentencing when the state argued for the imposition of a true-life sentence under ORS 137.719, there was no suggestion that the imposition of such a sentence was attributable to preindictment delay. Accordingly, the policies underlying the preservation rule were not served.

Further, we do not consider the claimed error to be plain. For an error to be considered plain, it must satisfy three criteria: (1) it must be legal error; (2) it must be "apparent," such that "the legal point is obvious, not reasonably in dispute"; and (3) it must appear on the face of the record. *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990). In this case, the only question is whether the error is sufficiently "apparent." Defendant argues that the error is obvious because he "retains a due process interest in having a sentencing proceeding that is fundamentally fair." However, it is not obvious that the preindictment delay led to the sentencing consequences that occurred in this case. As the state points out, ORS 137.719(2) provides an opportunity for a downward departure based upon findings of "substantial and compelling reasons" and it is at least arguable that, as the state contends, the difference in sentencing posture was, for these purposes, a consequence of defendant's own actions, not the preindictment delay.

We turn to the alleged prejudice from the loss of the treatment report. Like the 9-1-1 call in *Davis* and the

lost evidence in *Stokes*, the report here "might have been favorable to defendant. Or [it] might have had no evidentiary value, or [it] might have bolstered the case against defendant," but "[e]ither conclusion requires speculation," *Davis*, 345 Or at 575. However, "[w]ithout knowing the quality of [the lost] evidence, [a] defendant can only speculate that it might have helped his defense." *Stokes*, 350 Or at 60. Therefore, defendant has failed to show "actual, substantial prejudice" from the preindictment delay. *See Davis*, 345 Or at 575 (the test for due process, preindictment delay "require[s] that a defendant show actual, not presumed, substantial prejudice"); *Stokes*, 350 Or at 61 (actual prejudice from lost evidence requires some showing that the lost evidence was "more likely to help rather than hurt defendant's case").

        *Whitlow*, on which defendant relies, is distinguishable. There, the victim testified inconsistently with her initial disclosure about the abuse, which was known because the lead detective's report containing her initial disclosure was part of the record. Thus, the value of the missing evidence—the lead detective's testimony that was unavailable as a result of the delay—could be inferred from his report. In contrast, here, defendant did not establish that the report contained any information about B's initial disclosure or, if it did, whether that information would have been helpful to him.

        We recognize the difficulty a defendant faces when attempting to establish actual prejudice from the loss of evidence that he cannot view to assess its potential value. However, as the Oregon Supreme Court has made clear, it is the "statutes of limitation, and not due process, [that] protect defendants against the possible prejudice caused by preindictment delay." *See Stokes*, 350 Or at 59. Due process requires a defendant to establish that there was "substantial, actual prejudice," and the focus of that inquiry is on "whether the delay violated our society's fundamental conceptions of justice, fair play, and decency." *Id*. at 64. And to establish actual prejudice, a defendant must be able to point to something in the record that would allow an inference that the lost evidence would have helped his case to

establish actual prejudice. Here, defendant's arguments are based on presumptions about the contents and quality of the report.

Further, although defendant contends that the report was needed to obtain the counselor's name to question her about the detective's early designation of the crime as not involving force, defendant failed to establish that he could not have obtained the name by another means, such as by contacting PPD, the agency that spoke to the counselor, or LPD, the agency that later took over PPD's investigation and obtained its report. *See Davis*, 345 Or at 592 (concluding that the trial court did not err in its pretrial ruling that the defendant did not suffer undue prejudice by the loss of a 9-1-1 recording or by the evidentiary ruling that defendant could not elicit a description from a written report because defendant could have sought out the information by other means). Defendant has thus failed to meet his burden to establish that he was actually prejudiced by its absence. Therefore, despite the state's negligence in causing the delay, the trial court did not err in denying defendant's motion to dismiss.

Next, we turn to defendant's argument that the trial court plainly erred in failing to merge the guilty verdict of Count 2 (second-degree sexual abuse) with the guilty verdict of Count 1 (first-degree rape). *See* ORAP 5.45 (providing requirements for plain-error review). Defendant contends that those verdicts merge because the charges involve statutes with coextensive statutory elements. *See* ORS 161.067(1).[9] Specifically, defendant notes that Count 1 alleged that defendant committed first-degree rape, ORS 163.375(1), by having sexual intercourse with B using "forcible compulsion," and Count 2 alleged that defendant committed second-degree sexual abuse, ORS 163.425, by subjecting B to sexual intercourse without B's consent. And, defendant asserts that because "proof of forcible compulsion necessarily establishes that the victim did not consent," ORS 161.067(1) precludes entry of separate convictions. *See State*

---

[9]  ORS 161.067(1) provides:

"When the same conduct or criminal episode violates two or more statutory provisions and each provision requires proof of an element that the others do not, there are as many separately punishable offenses as there are separate statutory violations."

*v. Leistiko*, 352 Or 172, 179, 282 P3d 857 (2012) (explaining that "[i]mplicit in the requirement that a defendant caused the victim to engage in sexual intercourse by means of forcible compulsion is the proposition that the sexual act did not occur as a result of the victim's consent").

The state agrees that the trial court plainly erred. We agree and accept the state's concession. *See State v. Ledford*, 252 Or App 572, 287 P3d 1278 (2012), *abrogated on other grounds by State v. Gray*, 261 Or App 121, 322 P3d 1094 (2014) (concluding that trial court plainly erred in failing to merge guilty verdicts on first-degree rape and second-degree sexual abuse). Further, for the reasons stated in *State v. Ryder*, 230 Or App 432, 435, 216 P3d 895 (2009),[10] we conclude that it is appropriate to exercise our discretion to correct the error.

Convictions for first-degree rape (Count 1) and second-degree sexual abuse (Count 2) reversed and remanded for entry of a judgment of a single conviction for first-degree rape; remanded for resentencing; otherwise affirmed.

---

[10] There, we concluded that it was appropriate to exercise discretion to correct plain error because the gravity of the error (the imposition of an additional felony conviction) strongly militated in favor of the exercise of discretion, there was no indication that the defendant declined to object for strategic reasons, and the burden on the judicial system to amend the judgment and resentence the defendant was minimal. *Id.*